IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TROY WILLIAM SIPLE,               )
                                  )
          Plaintiff,              )
                                  )
     v.                           )          Civ. No. 15-570-GMS
                                  )
CAROLYN W. COLVIN,                )
Commissioner of                   )
Social Security,                  )
                                  )
          Defendant.              )
                                  )

---

Oderah C. Nwaeze, Esquire, of Duane Morris LLP, Wilmington, Delaware. Counsel for Siple. Of Counsel: Eddy Pierre Pierre, Esquire from Law Offices of Harry J. Binder and Charles E. Binder, P.C., New York, New York

Charles M. Oberly III, United States Attorney and Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Nora Koch, Acting Regional Chief Counsel and Roxanne Andrews, Assistant Regional Counsel, Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania.

---

**MEMORANDUM OPINION**



SLEET, District Judge

## I.   INTRODUCTION

Troy William Siple ("Siple") appeals from a decision of defendant Carolyn W. Colvin, Commissioner of Social Security ("Commissioner"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.   The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).   Presently before the court are the parties' cross-motions for summary judgment.   (D.I. 13, 16).   For the following reasons, Siple's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

## II.   BACKGROUND

### A.   Procedural History

On November 30, 2011, Siple filed an application for disability insurance benefits, alleging disability beginning July 15, 2011.   (Tr. 24).   Siple's claims were denied at the initial and reconsideration levels of review.   (D.I. 14 at 1).   Siple requested an administrative hearing, which was held before an Administrative Law Judge ("ALJ") on October 22, 2014.   (*Id.*).   On December 12, 2014, the ALJ issued a decision finding that Siple was not disabled.   (*Id.*).   The Appeals Council denied Siple's request for review, making the ALJ's decision the Commissioner's final decision. (*Id.*).   Having exhausted his administrative remedies, Siple brought this action for judicial review.

### B.   Siple's Testimony

Siple was born in 1983, and was 28 years old at the onset of his disability.   (D.I. 14 at 2). On a form completed in connection with the DIB claim, Siple indicated that he lived with his domestic partner, cared for his dogs by walking them three times and feeding them daily, prepared meals with his partner, might sleep for days at a time, might need help from his partner to get out of bed to shower and shave, did all of the household chores "inside and out," went outside daily,

shopped in stores and by mail and computer, shopped once monthly for food and groceries, sometimes could not drive due to anxiety, could pay bills and handle a savings/checking account, enjoyed landscaping and working in his yard, visited with family and friends, sometimes had difficulty getting along with family members and neighbors due to anxiety, suffered from attention deficit hyperactivity disorder, and did not handle stress well. (D.I. 17 at 2).

At the administrative hearing on October 22, 2014, Siple testified that he earned a general equivalency degree in 2002 and completed some college courses. (*Id.*). Siple has past relevant work as a retail assistant manager, a security guard, and a machine operator. (D.I. 14 at 2). He testified that he last worked in July 2011 and stopped due to his illness and "forced resignation." (D.I. 17 at 3). Upon questioning from the ALJ, Siple confirmed going to the movies, eating in restaurants, and shopping in the grocery store. (*Id.*). He also testified that he last used illegal drugs as a teenager and last drank alcohol one year earlier. (*Id.*). Siple testified that he moved into his Godmother's home three months earlier because she was bedridden and required care 24 hours a day. (*Id.*). Siple indicated that two aides visited the home twice daily, and a nurse visited once or twice weekly. (*Id.*). Siple testified that he socialized with one friend, with whom he lived before moving into his Godmother's home. (*Id.*). Siple testified that half of his days were bad days, in which he stayed in bed due to depression. (*Id.*). His friend brought him meals during those days. (Tr. 61). Siple testified that he passed the day by sleeping and reading. (*Id.*).

## C.   Medical History

Siple has a history of attention deficit hyperactivity disorder, bipolar disorder, depression, anxiety, social phobia, and substance abuse disorder. Siple reported having five inpatient hospitalizations since July 2011. (D.I. 17 at 3). Siple testified that suicide attempts precipitated three of those hospitalizations. (*Id.*). On July 20, 2011, Siple was admitted to the hospital for

2

increased depression. (D.I. 14 at 2). He was diagnosed with bipolar affective disorder with a GAF score of 30.[1] (*Id.*). On July 28, 2011, Siple discharged himself against medical advice. (*Id.*). In October and November of 2011, Siple participated in six sessions of counseling with Sandra Duemmler, PhD, a licensed psychologist. (D.I. 17 at 3).

Between March 14, 2012 and January 11, 2013, Siple was treated by various doctors from the CCHS Center for Comprehensive Behavioral Health, including Michele D. Cavanaugh, APRN; Janet Brown, APN; Mary Sweeney, LPC; Judith T. Marcus, M.D; Michael N. Marcus, MD, of the (the "CCHS Center"). (Tr. 359-406, 412-99). Siple was treated for bipolar disorder, mixed, with psychotic behavior and attention deficit disorder. (Tr. 362, 364, 395). Siple was prescribed mood stabilizing drugs and ADHD medication. (D.I. 17 at 3). Siple's mental status examinations typically revealed normal findings, including intact memory, attention, and concentration. (*Id.* at 4). On January 11, 2013, Siple reported he still had insomnia, anxiety, overwhelming stress and was traumatized by a friend's death. (D.I. 14 at 7).

On March 29, 2013, Siple went to the emergency room for major depression and suicidal ideation. (*Id.* at 8). After a few hours, he denied suicidal thoughts and was discharged. (*Id.*). On May 4, 2013, Siple was taken to the emergency room by a friend after he voiced suicidal thoughts. (*Id.*). He was diagnosed with bipolar disorder, current episode depressed, severe, with psychotic features, attention deficit disorder, a history of generalized anxiety disorder, and a GAF score of 20. (*Id.*). He was voluntarily admitted for his own safety. (*Id.*). Upon discharge on May 8, 2013,

---

[1]   A GAF score of 21-30 denotes behavior considerably influenced by delusions or hallucinations, serious impairment in communications or judgments, or the inability to function in almost all areas. Diagnostic and Statistical Manual of Mental Disorders 4th Ed. ("DSM-IV"), p. 34.

3

Siple exhibited an improvement in mood and resolution of auditory hallucinations. (D.I. 17 at 4). He had a GAF score of 50. (D.I. 14 at 8).

On October 3, 2013, Siple was voluntarily admitted to Rockford Center for severe depression, anxiety, and suicidal ideation and treated by Idee Brown, M.D. (*Id.*). Dr. Brown diagnosed bipolar affective disorder, recurrent, severe, mixed with suicidal ideation and psychotic features, a history of polysubstance abuse, and a GAF score of 20. (*Id.*). Dr. Brown changed Siple's medications. (D.I. 14 at 8-9). Siple was discharged on October 10, 2013 with a GAF score of 70. (*Id.* at 9). There is no evidence that he complied with the treatment recommendation to pursue a partial hospitalization program. (D.I. 17 at 4).

On October 20, 2013, Siple went to the emergency room because of suicidal thoughts. (D.I. 14 at 9). He had stopped taking all his medications. (*Id.*). After a few hours, Siple was discharged. (*Id.*). Between November 27, 2013 and January 20, 2014, Siple had three counseling sessions with Dr. Patricia Litfrak. (Tr. 669-75). A mental status exam revealed a depressed and anxious mood and depressed affect. (D.I. 14 at 10). Dr. Lifrak diagnosed bipolar disorder and a GAF score of 60. (*Id.*). She prescribed mood stabling drugs, and adjusted the medications accordingly. (*Id.* at 10-11).

On February 20, 2014, Siple returned to the emergency room with complaints of passive suicidal ideation and depression. (D.I. 17 at 5). Siple reported that he was discharged from his outpatient psychiatrist for noncompliance. (*Id.*). Health care providers instructed Siple to pursue treatment with a new mental health clinic. (*Id.*). He was discharged with a referral to an outpatient mental health program. (D.I. 14 at 9).

On April 30, 2014, Siple was examined by Chandrakala Kathiravan, M.D. (D.I. 14 at 11). Siple's main concern was that he had been off medication since January. (*Id.*). He reported

4

alternating episodes of mania and depression even when he was on medication. (*Id.*). Dr. Kathiravan diagnosed bipolar disorder with a GAF score of 55. (D.I. 17 at 5). She prescribed mood stabilizing drugs. (D.I. 14 at 11). Siple received follow-up treatment in June and July of 2014. (*Id.*).

On September 5, 2014, Siple was "not doing well." (D.I. 14 at 12). A mental status exam revealed a depressed and crying mood and affect, psychomotor retardation, suicidal ideation with plan (thinking about lying on train tracks, overdosing, or hanging), with limited insight and judgment. Dr. Kathiravan opined Siple was a danger to himself without proper inpatient treatment and hospitalized him that day. (*Id.*). He was subsequently treated as an inpatient through September 10, 2014. (*Id.*).

On September 11, 2014, Siple saw Dr. Kathiravan and reported his depression was better with improved motivation. (*Id.*). Siple stated that Zoloft and Seroquel dosages were increased while he was an inpatient. (*Id.*). Siple reported continued depression on September 19, 2014. (*Id.*). He described that he initially felt better after the medication adjustment in the hospital, but had a relapse of his depression the previous week. (*Id.*). On September 23, 2014, Dr. Kathiravan referred Siple to Dr. Gupta for ECT. (*Id.*). Siple declined further inpatient or partial hospitalization. (D.I. 17 at 5).

### D.   Medical Opinions

#### 1.   Mujib Obeidy, M.D. – Treating Psychiatrist

On March 10, 2012, Dr. Obeidy completed a Psychiatric/Psychological Impairment Questionnaire, summarizing his findings based on monthly treatment of Siple between July 2007 and February 6, 2012. (D.I. 14 at 3). He diagnosed bipolar disorder type I, ADHD, polysubstance

abuse, and a GAF score of 55.[2] (*Id.*). Dr. Obeidy opined that Siple was markedly limited (defined as effectively precluded) in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and travel to unfamiliar places or use public transportation. (*Id.*). Siple experienced episodes of decompensation in work-like settings which caused him to withdraw from that situation. (*Id.*). Dr. Obeidy estimated that Siple would likely be absent from work more than three times a month as a result of his impairments (Tr. 704-705).

In an undated narrative report with a facsimile date stamp of August 10, 2012, Dr. Obeidy opined that Siple's prognosis was poor due to the fact that his mood disorder began in childhood and that he had shown a slow but steady decrease in his ability to cope with symptoms. (D.I. 14 at 5). When depressed, Siple was 100% disabled. (*Id.*). He was unable to concentrate for prolonged periods and his ability to remember detailed instructions was significantly affected. (*Id.*). His ability to work with peers or the general public was impacted by his irritability and hypersensitivity and he responded poorly to supervisory criticism. (*Id.*). Changes in routine were handled poorly. (*Id.*). Dr. Obeidy thought that even if Siple were capable of simple, repetitive work, he would end up missing work several times a month due to his decompensations. (*Id.*).

---

[2]     A GAF score of 51-60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g.. few friends, conflicts with peers or co-workers). DSM-IV, p. 34.

### 2.    Chandrakala Kathiravan, M.D – Treating Psychiatrist

On October 9, 2014, Dr. Kathiravan composed a narrative stating that Siple had medically documented persistence of (1) depressive syndrome characterized by anhedonia, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, thoughts of suicide, and hallucinations, delusions or paranoid thinking; and (2) manic syndrome characterized by hyperactivity, flight of ideas, decreased need for sleep, easy distractibility, and hallucinations, delusions or paranoid thinking. (D.I. 14 at 12). These symptoms had resulted in marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decompensation. (*Id.* at 13). Siple also had a medically documented history of a chronic affective disorder, which lasted at least two (2) years and had caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support. (*Id.*). Siple had repeated episodes of decompensation and a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. (*Id.*).

Dr. Kathiravan also completed a Mental Impairment Questionnaire on October 9, 2014. (*Id.*). She diagnosed bipolar I disorder, severe with psychotic features and a GAF score of 50. (*Id.*). Clinical findings included depressed mood, persistent anxiety, blunt and labile affect, feelings of guilt or worthlessness, suicidal ideation with past suicide attempts, difficulty concentrating, easy distractibility, flight of ideas, poor recent memory, paranoia, recurrent panic attacks, anhedonia, decrease energy, hyperactivity, impulsive behavior, social isolation, delusions, auditory hallucinations, decreased need for sleep and excessive sleep. (*Id.*).

Dr. Kathiravan opined that Siple was markedly limited (symptoms constantly interfered or more than 2/3 of a workday) in his ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and consistently be punctual; sustain ordinary routine without supervision; work in coordination with or near others without being distracted by them; complete a workday without interruptions for psychological symptoms; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior; respond appropriately to workplace changes; travel to unfamiliar places or use public transportation; set realistic goals; and make plans independently. (*Id.*). Siple had difficulty just getting out of bed and attending to his daily living and personal hygiene needs on a consistent basis. (*Id.*). On average, Siple was likely to be absent from work as a result of his impairments more than 3 times per month. (*Id.*).

### 3.    Richard G. Ivins, Ph.D. – SSA Consultative Psychologist

On May 16, 2012, Richard Ivins, Ph.D., conducted a consultative examination at the request of the Social Security Administration. (D.I. 14 at 14). Dr. Ivins diagnosed bipolar disorder, most recent, depressed, attention deficit hyperactivity disorder, and social phobia. (*Id.*). Dr. Ivins's mental status examination revealed no memory deficits. (D.I. 17 at 4). Siple reported that his attention and concentration skills were good. (*Id*). Dr. Ivins assessed a GAF score of 50. (*Id.*).

Dr. Ivins opined on a psychological functional capacities evaluation (FCE) form that Siple had a mild impairment in the ability to relate to other people, in the restriction of his daily activities, in the deterioration of personal habits, and in the constriction of his interests. (*Id.*). Dr. Ivins further assessed a mild impairment in Siple's ability to understand simple, primarily oral instructions, carry out instructions under ordinary supervision, and perform routine, repetitive

8

tasks under ordinary supervision; and a moderate limitation in his ability to sustain work performance and attendance in a normal work setting and to cope with pressures of ordinary work. (*Id.*).

### 4.    Pedro Ferreira, Ph.D., SSA Psychological Expert

In June of 2012, Pedro Ferreira, Ph.D., a state agency psychological expert, reviewed Plaintiff's file and opined on a Mental Residual Functional Capacity Assessment form that Plaintiff could perform simple routine work despite having moderate mental health symptoms that affected his concentration, persistence, or pace. (D.I. 17 at 6). Dr. Ferreira further opined that Plaintiff had only a mild restriction in his activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, and had experienced one to two repeated episodes of decompensation of extended duration. (*Id.*).

### E.    Relevant Portion of Vocational Expert's Testimony

A vocational expert ("VE") testified that an individual of Siple's age, education, and work history who could only perform unskilled work with reasoning level 1 or 2, and could have no more than occasional interaction with co-workers and supervisors, no interaction with the general public, no working around intoxicants such as pharmaceuticals and alcohol, no work at exposed heights, and no more than occasional exposure to moving machinery would be unable to perform any of Siple's past work. (D.I. 14 at 16). Such an individual would be able to perform work as a hand packager, an assembler for wet wash, and a laundry worker. (*Id.*).

### F.    ALJ's Decision

In a decision dated December 12, 2014, the ALJ found that Siple had the severe impairments of bipolar affective disorder, major depressive disorder, attention deficit hyperactivity disorder, anxiety disorder, social phobia and substance abuse disorder. (D.I. 14 at 16). Siple

9

retained the residual functional capacity ("RFC") to perform unskilled work requiring only reasoning level 1-2, no more than occasional interaction with coworkers and supervisors, no interaction with the general public, no work around intoxicants such as pharmaceuticals and alcohol, no work at exposed heights, and no more than occasional work around moving machinery. (*Id.*). Based on this RFC, the ALJ conceded that Siple was unable to perform any past work but found he could perform other work as a hand packager, an assembler for wet wash, and a laundry worker. (*Id.*).

## III.   STANDARD OF REVIEW

A reviewing court will reverse the ALJ's decision only if the ALJ did not apply the proper legal standards or if the decision was not supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). If the ALJ's findings of fact are supported by substantial evidence, the court is bound by those findings even if it would have decided the case differently. *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). Evidence is considered "substantial" if it is less than a preponderance but more than a mere scintilla. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence supports the ALJ's findings, the court may not undertake a *de novo* review of the decision, nor may it re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.    DISCUSSION

Siple raises three arguments on appeal.  Siple contends that the ALJ: (1) failed to properly weigh the opinions of Siple's treating doctors; (2) erred in finding Siple's subjective testimony not entirely credible; and (3) failed to account, in the hypothetical question presented to the VE, for Siple's moderate limitations in concentration, persistence, and pace.  Each of these arguments will be addressed in turn.

### A.    Weight of Treating Psychiatrists' Opinions

Siple claims that the ALJ erred in giving little weight to the opinion of his treating psychiatrists, Dr. Obeidy and Dr. Kalkstein.  (D.I. 14 at 17-24).  The opinion of a treating psychiatrist is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).  However, an ALJ is entitled to disregard a treating psychiatrist's opinion when it is "conclusory, lacking explanation, and inconsistent with other medical evidence in the record."  *Griffin v. Comm'r Soc. Sec.*, 305 F. App'x 886, 891 (3d Cir. 2009); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (stating that where there is contradictory evidence, an ALJ may reject the opinion of the treating physician outright, or may accord it more or less weight depending on the extent to which it is supported).  The court finds that the ALJ gave appropriate weight to the opinions of Dr. Obeidy and Dr. Kalkstein for the reasons stated below.

### 1.    Dr. Obeidy

As an initial matter, the ALJ did not, as Siple asserts, accord "no weight" to Dr. Obeidy's opinion.  (D.I. 14 at 17).  Instead, the ALJ "generally agreed with the specific limitations noted by Dr. Obeidy" in his written summary of Siple's mental health treatment.  (D.I. 17 at 9).  Specifically,

the ALJ agreed that the objective medical evidence and treatment notes supported Dr. Obeidy's conclusions that Siple was unable to concentrate for prolonged periods; his ability to remember detailed instructions was significantly affected; and his ability to work with peers and the general public was impacted. (Tr. 32). Nevertheless, the ALJ properly found that these limitations did not preclude the ability to perform unskilled, reasoning level 1-2 work, with limited social contact. (*Id.*). In other words, the ALJ adopted requirements for Siple's residual functional capacity that reflected the restrictions set forth in Dr. Obeidy's opinion.

The ALJ correctly gave "no weight" to Dr. Obeidy's opinion that Siple was "100% disabled." (Tr. 33). It is well established that "[o]nly the ALJ can make a disability determination." *Miller v. Colvin*, 2015 WL 9484464, at *9 (D. Del. Dec. 29, 2015); *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011) ("The law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity."); 20 C.F.R. § 416.927(d) ("Opinions [that a claimant is disabled] are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner."). Accordingly, the court finds no error in the ALJ's treatment of Dr. Obeidy's opinion of Siple's functional limitations.

### 2.    Dr. Kathiravan

Dr. Kathiravan completed two opinion questionnaires: (1) a questionnaire addressing whether Siple met the 12.04 listing requirements; and (2) a mental impairment questionnaire. (Tr. 33). In the listing questionnaire, Dr. Kathiravan's opined that Siple had "marked" limitations in activities of daily living; maintaining social functioning; maintaining concentration, persistence, and pace; and repeated episodes of decompensation. (Tr. 33). The ALJ gave these opinions "no weight." (Tr. 33). In the mental impairment questionnaire, Dr. Kathiravan opined that Siple generally had "moderate-to-marked," or "marked'" limitations in all functional areas, with only

12

"moderate" limitations indicated for working with one to two step instructions. (Tr. 33). The ALJ gave a range of weight to these opinions, including: "some weight" to the moderate limitations in Siple's ability to understand, remember, and carry out simple instructions; "significant weight" to the marked limitations in working with detailed instructions; and "little weight" to the opinion that social limitations are "moderate-to-marked" or "marked," as opposed to just moderate.[3] (Tr. 33-34).

The ALJ was not required to adopt all of Dr. Kathiravan's opinion solely because he found some parts persuasive. *Wilkinson v. Comm'r of Soc. Sec.*, 558 Fed. App'x 254, 256 (3d Cir. 2014). Instead, the ALJ is entitled to give some parts of a treating psychiatrist's opinion less weight when they are "inconsistent with other medical evidence in the record." *Griffin v. Comm'r Soc. Sec.*, 305 F. App'x 886, 891 (3d Cir. 2009); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (stating that where there is contradictory evidence, an ALJ may accord the opinion less weight depending on the extent to which it is supported); 20 C.F.R. § 404.1527(d)(2).

The ALJ properly gave less than controlling weight to those portions of Dr. Kathiravan's opinions that were inconsistent with substantial evidence in the record. For example, as the ALJ explained, the record indicated that Siple's daily activities were "somewhat limited by lack of energy and depression," but "he had no problems with personal care, was able to feed himself during the day…, take care of two dogs, do household chores and work outside, drive, handle his finances, and shop in stores once a month." (Tr. 27). Similarly, Siple had "moderate," not marked, difficulties in social functioning. (*Id.*). Substantial evidence showed that Siple liked to spend time with friends and family, shopped in stores, and was able to eat in restaurants. (Tr. 27-28). Siple

---

[3]     For opinions given any weight, the ALJ adopted limitations in the residual functional capacity to accommodate those difficulties. Siple was limited to unskilled work with reasoning level 1 or 2 and limited social interaction. (Tr. 33).

had "moderate," not marked, difficulties in maintaining concentration, persistence, and pace. (Tr. 28). Siple reported to a consultative psychologist in 2012 that his attention and concentration skills were good; no objective memory deficits were noted; and he was able to do serial 7's. (*Id.*). Siple's 2013 mental status examination was essentially normal, despite Siple's racing thoughts at the time. (*Id.*). Siple testified that he reads books about bipolar disorder and self-help books, and "only sometimes" has difficulty concentrating. (*Id.*). Finally, the ALJ found only one to two episodes of decompensation. (*Id.*). Siple has not identified additional episodes that should have been considered.

In reaching his conclusion, the ALJ also noted that the marked limitations in Dr. Kathiravan's opinions were inconsistent with a GAF score of 55 she assessed in April 2014, which corresponds to moderate functional difficulties or moderate symptoms. (Tr. 34). Contrary to Siple's assertions, the ALJ did not err in relying upon or referring to Siple's GAF score of 55. (D.I. 14 at 23). Siple is correct that "[t]he GAF scale appears to have fallen into disfavor." *Harris v. Colvin*, 2015 WL 10097520 at * 5 (E.D. Pa. Oct. 27, 2015). "Due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Solock v. Astrue*, 2014 WL 2738632, at * 6 (M.D. Pa. June 17, 2014). Nevertheless, the Social Security Administration allows ALJs to use GAF ratings as opinion evidence when assessing disability claims involving mental disorders. *Hundley v. Colvin*, 2016 WL 6647913, at *4 (W.D. Pa. Nov. 10, 2016). According to the Social Security Administration, a "GAF score is never dispositive of impairment severity," and thus an ALJ should not "give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence." SSA AM 13066 at 5 (July 13, 2013). Here, it is clear that the

ALJ did not give the GAF score of 55 dispositive consideration. Rather, it was one piece of evidence among several identified showing inconsistencies between Dr. Kathiravan's opinions and the record.

Finally, Siple relies on *Brownawell* to argue that opinions by non-examining consultants are entitled to only "minimal weight" and, therefore, the ALJ erred in giving more weight to certain opinions of the state agency consultants than Siple's treating physicians. (D.I. 14 at 20 (citing *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008)). *Brownawell*, however, did not overturn the Commissioner's regulations. Social Security regulations expressly recognize that non-examining state agency consultants are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation and whose opinions must be considered by ALJ. *See* Fed. Reg. 11866 (Mar. 7, 2000). Consistent with this regulation, the Third Circuit has recognized that an ALJ may credit the opinion of a non-examining, non-treating physician over the opinion of a treating physician. *McQueen v. Comm'r*, 2009 WL 1090330, at *4-5 (3d Cir. Apr. 23, 2009); *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (stating that where "the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit"). Accordingly, an ALJ does not err by giving more weight to the opinions of a non-examining consultant that a treating doctor. Here, the court finds that the ALJ properly weighed the medical opinions that Siple presented.

### B.    Credibility Determination

The ALJ concluded that Siple's impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence, and limiting

15

effects of those symptoms were "not entirely credible."[4]   (Tr. 18-19).  Siple argues that the ALJ

erred in giving "little weight" to Siple's subjective testimony of his inability to work.  (D.I. 14 at

125-26; Tr. 31).  A claimant's subjective complaints will not alone establish a disability.  20 C.F.R.

§ 416.929(a).  Instead, the ALJ must first consider whether there are medical signs or laboratory

findings which show that the claimant has a medical impairment that could reasonably be expected

to produce the pain or other symptoms alleged.  20 C.F.R. § 416.929(b).  Second, the ALJ must

evaluate the intensity and persistence of the symptoms to determine the effect on the claimant's

capacity to work.  20 C.F.R. § 416.929(c).  In doing so, the ALJ must consider all the applicable

evidence, including objective medical evidence; the claimant's daily activities; the type, dosage,

effectiveness, and side effects of medications; statements from the claimant and her physicians;

and any treatment for the impairment.  *Id.*  "Evidence can be used to discount credibility if such

evidence demonstrates a contradiction or inconsistency."  *Lopez v. Colvin*, 2016 WL 4718153, at

*6 (M.D. Pa. Aug. 3, 2016).

     The ALJ identified substantial evidence in support of his decision to find Siple's testimony

not entirely credible.  First, an ALJ can support his credibility assessment by citing "specific

instances where [the claimant's] complaints about pain and other subjective symptoms were

inconsistent with" the objective medical evidence of record.  *Hartranft v. Apfel*, 181 F.3d 358, 362

(3d Cir. 1999).  Here, the ALJ identified objective medical evidence in the record inconsistent with

Siple's claims of disabling limitations.  For example:

- He is able to drive a car: this shows concentration and persistence, and an ability to deal with the stress inherent in operation of a motor vehicle.  (Tr. 32).

---

[4]     The court notes that a finding of "not entirely credible" means that the ALJ found some of Siple's testimony somewhat credible.

- His mental status examinations from March 2012 to January 203 were typically normal, with intact memory, attention, and concentration, regardless of his reported symptoms. (Tr. 30).

Second, contrary to Siple's assertions, an adverse credibility assessment may be supported by evidence that a claimant's subjective complaints are inconsistent with the claimant's description of his daily activities. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999); *Bacon v. Colvin*, 2016 WL 556727, at *8 (D. Del. Feb. 12, 2016).  Here, the ALJ noted that Siple's subjective complaints were inconsistent with his activities of daily living.  For example:

- Siple indicated in a January 2012 function report that his daily activities were somewhat limited by lack of energy and depression causing him to stay in bed. However, he had no problems with personal care, was able to feed himself during the day while his domestic partner worked, take care of two dogs, do household chores, work outside, drive, handle his finances, and shop in stores once a month. (Tr. 27)

- Siple's domestic partner stated in a December 2012 function report that "[d]espite [Siple's] lack of interest and energy, ... [he] drove, shopped in stores once a month, handled his finances, and worked in the yard one to three times a month.  (Tr. 27).

- Siple reported that he had problems getting along with other people, was isolated and withdrawn, and suffered from social anxiety.  (Tr. 27-28).  But, Siple is able to shop at Lowe's, garden for his neighbors, take on a big landscaping job, care for his godmother and her 92 year old mother, use the Internet to arrange a meeting with a potential date, and visit the beach.  (Tr. 32).  Siple has also "maxed out" his credit cards and spent money on friends, which indicates an ability to visit retail establishments.  (*Id.*).  Siple testified he went to a movie theater the month prior to the hearing, and went to a Red Lobster restaurant a couple of weeks prior to the hearing.  (*Id.*).  Siple visited a WalMart and shops at a grocery store.  (*Id.*).

Third, "an ALJ may consider a claimant less credible if the individual fails to follow the prescribed treatment plan without good reasons." *Vega v. Comm'r of Soc. Sec.*, 358 F. App'x 372, 375 (3d Cir. 2009); *see also Klangwald v. Comm'r of Soc. Sec.*, 269 Fed. Appx. 202, 205 (3d Cir. 2008) (holding that a claimant's failure to receive medical treatment consistent with severity of

claimed symptoms is highly relevant in evaluating credibility).[5] Here, the ALJ noted several instances where Siple was non-compliant with his treatment or appeared to not seek treatment, without good cause. Specifically:

- Siple was hospitalized in July 2011 and then discharged himself against medical advice from a partial hospital program. Siple had some therapy in October and November 2011, but no other treatment until March 2012. (Tr. 30)

- His records for mental health treatment extend only through January 2013. (*Id*).

- Hospital records document ER visits for depression and suicidal ideation in March and May 2013. After discharge, Siple was referred for follow-up with his outpatient therapist and psychiatrist, but there are no records showing actual follow-up. In fact, there is no further mental health treatment documented until October 2013. (Tr. 30).

- After the October 2013 hospitalization, Siple was to follow-up with a partial hospital program. However, there are no records indicating that Siple actually complied with this treatment recommendation. (Tr. 30).

- In February 2014, Siple admitted that he had been discharged from his outpatient psychiatrist for noncompliance with treatment recommendations. (Tr. 30) In April 2014, Siple indicated that he had been off medications for "several" months. (Tr. 31).

- In September 2014, Siple's depression worsened, but he declined further inpatient or partial hospitalization programs. (Tr. 31)

Finally, the ALJ noted some inconsistencies between Siple's own statements. For example:

- Siple stated in his function report that he had problems with memory and problems with concentration and completing tasks. (Tr. 28). But Siple reported to a consultative psychologist in 2012 that his attention and concentration skills were good, and the psychologist found no objective memory deficits. (Tr. 28). Moreover, Siple testified that he reads books and "only sometimes" has difficulty concentrating. (*Id*.).

---

[5]     Siple has cited cases from other circuits holding that the ALJ should consider non-compliance as evidence of a disabling mental impairment. (D.I. 14 at 26). Because the Third Circuit has not overruled its holdings in *Vega* and *Klangwald* , the court does not find these other cases persuasive.

- In April 2013, Siple saw his primary care physician twice and denied fatigue, anxiety, and depression. (Tr. 30).

- Siple testified at the hearing in October 2014 that "[i]t's been a year" since he drank alcohol, but told his therapist in April 2014 that he was "drinking daily non-stop." (Tr. 32).

- Siple testified he did not use social media, but told a therapist a month before the hearing that he met someone through an online dating website. (Tr. 32).

Siple argues that the ALJ improperly relied on his statements that he had not had an alcohol drink in a year and did not use social media. (D.I. 14 at 26). Specifically, Siple points out that his attorney called attention in his opening statement at the hearing to records showing that Siple was being treated for alcohol dependence in April 2014. (*Id.*). Siple's decision to give testimony contrary to those records shortly after they were discussed may be unfortunate, but it does not mean that the ALJ erred in relying on Siple's inconsistent testimony. On the evidence about social media, Siple told his therapist a month before the hearing that he had met someone online through a website. (Tr. 584). At the hearing, the colloquy between Siple and the ALJ was:

> Q. I don't think anybody goes to libraries anymore. All right. Do you use social media at all? Facebook? Twitter?
>
> A. No, I don't.
>
> Q. Instagram? Anything?
>
> A. No.

(Tr. 51). Siple argues that a dating website does not qualify as "social media." (D.I. 14 at 26). The ALJ's colloquy demonstrates that he was trying to gauge whether Siple was using the internet to connect with other people, as opposed to using the internet to just read information. Accordingly, there were reasonable grounds to find Siple's testimony inconsistent with his earlier statements. In summary, the court finds that the ALJ's determination that Siple's subjective

complaints were not credible is well-explained and supported by substantial evidence in the evidentiary record.

### C.   Hypothetical Questions

Siple claims that the ALJ's hypothetical questions to the VE failed to account for the ALJ's own finding that Siple had moderate limitations in concentration, persistence, and pace. (D.I. 14 at 27). The Third Circuit has held that a hypothetical posed to a vocational expert must include "all of the claimant's credibly established limitations, but does not require that the vocational expert be apprised of limitations which have been determined not to affect the claimant's RFC." *Covone v. Comm'r Soc. Sec.*, 142 Fed. Appx. 585, 587 (3d Cir. 2005). Here, in formulating the RFC, the ALJ relied on a hypothetical question limiting Siple to unskilled work with "reasoning level one or two;" "no more than occasional interaction with coworkers and supervisors;" and "no interaction with the general public." (Tr. 64). The Dictionary of Occupational Titles defines a reasoning level 1 as the ability to "[a]pply commonsense understanding to carry out simple one-or two-step instructions," and "[d]eal with standardized situations with occasional or no variables." DOT, Appendix C, Section III. Reasoning level 2 is the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions," and "[d]eal with problems involving a few concrete variables in or from standardized situations." *Id.*

Several courts have found that an ALJ's hypothetical question adequately accounts for a plaintiff's moderate limitations in concentration, persistence, and pace by limiting the plaintiff to jobs with reasoning level 1 or 2. *See, e.g., Rounds v. Comm'r of Soc. Sec.*, 2016 WL 5661594, at *12 (E.D. Mich. Sept. 30, 2016) (limitation to reasoning level 1 properly accounted for plaintiff's moderate limitation in concentration, persistence, or pace); *Miller v. Colvin*, 2015 WL 1915658, at *7 (N.D. Ill. Apr. 27, 2015) (no remand required to consider moderate limitations in

20

concentration, persistence, and pace where hypothetical limited plaintiff to jobs with no public contact and a reasoning level of one or two); *Kight v. Colvin*, 2014 WL 1281049 at \*3 (N.D. Tex. Mar. 31, 2014) (ALJ's RFC determination limiting plaintiff to jobs with reasoning level one or two reasonably incorporated moderate deficiencies in concentration, persistence, or pace); *Brown v. Astrue*, 2012 WL 761681, at \*10 (E.D. Cal. March 6, 2012) (noting that a job with an SVP of 2 and a reasoning level of 2 "fully encompasses any and all restrictions imposed by Plaintiff's moderate difficulties with concentration, persistence, and pace."). Consistent with these cases, the court finds that ALJ's hypothetical question adequately captured Siple's moderate limitations in concentration, persistence, and pace.[6] Accordingly, the court finds no error warranting remand.

## V.     CONCLUSION

For the foregoing reasons, Siple's motion for summary judgment (D.I. 13) is denied; and the Commissioner's motion for summary judgment (D.I. 16) is granted. An appropriate order will be entered.

Dated: January _5_, 2017

_____
UNITED STATES DISTRICT JUDGE

---

[6]     Siple cites two cases regarding concentration, persistence, and pace that are distinguishable. (D.I. 14 at 27). *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004) addressed the use of "simple one or two-step tasks" to capture moderate limitations in concentrate, persistence, and pace, not the words "reasoning level 1 or 2." In *Solomon v. Colvin*, 2013 WL 5720302 (D. Del. Oct. 22, 2013), the court never disclosed the ALJ's findings as to the plaintiff's functional limitations in concentration, persistence, and pace. Unless the plaintiff in that case, like the plaintiff in this case, had moderate limitations in concentration, persistence, and pace, the holding in that case cannot be compared to this case. Accordingly, *Solomon* is unpersuasive.